**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **AUTHOR RAY TURNER,**     ) | |
|                    ) | |
|       **Petitioner,**     ) | |
|                    ) | |
| **v.**     ) | **Case No. 3:16-cv-02593** |
|                    ) | **Judge Trauger** |
| **KEVIN GENOVESE, Warden,**[1]     ) | |
|                    ) | |
|       **Respondent.**     ) | |

## MEMORANDUM

The petitioner, Author Ray Turner, is a state prisoner incarcerated at the Turney Center Industrial Complex in Only, Tennessee. He has filed a *pro se* petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) The respondent has filed an answer to the petition (Doc. No. 21) and the state court record (Doc. No. 20). The petitioner has filed a reply to the respondent's answer. (Doc. No. 28.)

The matter is ripe for the court's review, and the court has jurisdiction. The respondent does not dispute that the petition is timely, that this is the petitioner's first § 2254 petition related to these convictions, and that the claims of the petition have been exhausted. (Doc. No. 21 at 1–2.)

---

[1]     As the proper respondent to a petition under § 2254 is the warden of the institution where the petitioner is in custody, *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (citing 28 U.S.C. §§ 2242, 2243), and the petitioner has transferred to a different prison since filing this action, the proper respondent here is Kevin Genovese, Warden of Turney Center Industrial Complex, rather than Warden Cherry Lindamood. In the order accompanying this Memorandum, the Clerk will be directed to make this change on the docket.

Having reviewed the petitioner's arguments and the underlying record, the court finds that an evidentiary hearing is not required. As explained below, the petitioner is not entitled to relief under § 2254, and his petition will therefore be denied.

## I.    Procedural History

In July 1995, the petitioner was indicted on, and subsequently entered a negotiated plea of guilty to, charges of especially aggravated kidnapping, aggravated robbery, and two counts of aggravated rape. (Doc. No. 20-19 at 10.) Following his sentencing to an effective 40-year prison term (*id.*), the petitioner unsuccessfully pursued post-conviction relief through the state trial and appellate courts, as well as habeas relief in this court. After the Sixth Circuit Court of Appeals affirmed this court's denial of habeas relief based on the statute of limitations, *Turner v. Mills*, 219 F. App'x 425 (6th Cir. 2007), the petitioner filed two successive petitions for writ of habeas corpus in state court. The second of these petitions was ultimately granted because the petitioner's sentences for aggravated rape were ordered to be served at a bargained-for release eligibility percentage (30%) that varied from the state statutory requirement of one hundred percent. On April 25, 2012, the Tennessee Court of Criminal Appeals affirmed the trial court's judgment allowing the petitioner to withdraw his guilty plea because of this illegal sentence and remanded the case for further proceedings. *Turner v. Mills*, No. E2011-00074-CCA-R3-HC, 2012 WL 1431220 (Tenn. Ct. Crim. App. Apr. 25, 2012).

Thereafter, in August 2012, the petitioner was tried and convicted by a Davidson County jury on charges of especially aggravated kidnapping, aggravated robbery, attempted aggravated rape, and four counts of aggravated rape. On October 5, 2012, he was sentenced to an effective term of 70 years' imprisonment. (Doc. No. 20-19 at 12.)

On direct appeal, the petitioner argued as follows:

1. The trial court erred in denying the defendant's motion to suppress his statements to police.

2. The trial court erred in denying the defendant's motion to dismiss due to the State's destruction of evidence.

3. The trial court erred in ruling that whether DNA evidence matched the defendant was irrelevant, and that if the defendant argued or presented evidence that no DNA match was proven, the State would be allowed to present evidence that the defendant had previously pleaded guilty in this case.

4. The evidence contained in the record is insufficient to support the defendant's convictions for aggravated rape in counts 6 and 7 because the State did not prove beyond a reasonable doubt that the defendant was armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon.

5. The trial court erred in allowing separate convictions for aggravated rape in counts 3 and 4 and attempted aggravated rape in count 5 because separate convictions violate the defendant's protections against double jeopardy.

6. The trial court erred in imposing partial consecutive sentences, and in sentencing the defendant to serve one hundred percent of his sentence on his conviction for especially aggravated kidnapping.

(*Id.* at 9.)

The Tennessee Court of Criminal Appeals affirmed the conviction on May 28, 2014. (Doc. No. 20-21.) The Tennessee Supreme Court denied the petitioner's application for permission to appeal.

The petitioner filed a timely petition for post-conviction relief in the convicting court on December 29, 2014. He was appointed post-conviction counsel, and an amended post-conviction petition was filed. Following an evidentiary hearing, the trial court denied the post-conviction petition. On post-conviction appeal to the Tennessee Court of Criminal Appeals, the petitioner raised the following issues:

1. Whether or not trial counsel failed to provide effective assistance of counsel by not using available impeachment evidence regarding a potential misidentification of the defendant by the State's chief witness/victim at trial.

2. Whether or not trial counsel failed to provide effective assistance of counsel by not investigating the physical and mental health history of the State's chief witness/victim at trial regarding support for impeachment regarding identity and a defense of misidentification.

3. Whether or not trial counsel failed to provide effective assistance of counsel by not exploring the possibility for the need to seek recusal of the trial judge due to his employment at the Office of the Davidson County District Attorney General during the time when the case was originally being investigated and prosecuted in 1995.

(Doc. No. 20-29 at 5.) Post-conviction appellate counsel also argued in his brief that trial counsel was ineffective for failing "to raise the issues advanced by the petitioner before and after trial in 2012 regarding a potential violation of his constitutional rights after his conviction was vacated and he was placed back into the custody of the Davidson County Sheriff without a new charging instrument." (*Id.* at 11.) The Court of Criminal Appeals addressed each of these ineffective-assistance arguments (Doc. No. 20-31 at 5) and affirmed the decision of the post-conviction trial court on July 22, 2016. (Doc. No. 20-31.) The petitioner did not seek permission to appeal this decision to the Tennessee Supreme Court.

The petitioner filed his § 2254 petition in this court on September 23, 2016.

## II. Statement of Facts

After the petitioner was allowed to withdraw his guilty plea, he returned to Davidson County Criminal Court and, on March 16, 2012, filed a motion to suppress his statements to police. At a hearing on the motion, the following evidence was presented:

Charles Thomas, a detective with the Rutherford County Sheriff's Office, testified that he was dispatched to 7822 Clearwater Court on March 16, 1995, and there he encountered the Defendant. Detective Thomas said that, when he arrived at the house he knocked on the door, and a woman named Tanya Johnson answered the door. The Defendant was asleep in the bedroom. The detective asked the Defendant to step outside, where he read the Defendant his Miranda warnings. After so doing, the detective offered the Defendant an opportunity to tell him his side of the story. Detective Thomas documented the Defendant's statement.

> The Defendant told Detective Thomas that he needed a ride to Rutherford County, so he kidnapped a lady, put her in the trunk, and brought her to Rutherford County. Another detective, Commander Acton, asked the Defendant if he had raped the woman, and the Defendant stated that he had. The Defendant told the detectives that he planned to release the woman.

(Doc. No. 20-21 at 4–5.) Detective Thomas testified that he was one of four officers that responded to the call at this house near the location of the victim, due to the call being regarded as a possible emergency. (*Id.* at 5.) Amanda Preble Acton, a commander with the Rutherford County Sheriff's Department, also testified at the hearing that she responded to the call in this case. (*Id.*) Acton "confirmed Detective Thomas's account of the events," and that she "was present when the Defendant made a statement to police admitting that he had 'taken a lady.'" (*Id.*) "Commander Acton asked the Defendant if he had raped the victim, and the Defendant responded, "[Y]es." Commander Acton testified that she never saw anyone use any signs of threat or coercion to induce the Defendant to make these statements." (*Id.*)

The petitioner gave an entirely different account of this encounter. He testified that he was eighteen years old at the time of his arrest, and that once the officers led him from the house of his girlfriend, Ms. Johnson, he got on the ground as he was instructed and the officers formed a semicircle around him with their guns pointed at him. (*Id.* at 6.) The petitioner testified that he denied raping anyone despite aggressive and suggestive questioning from "the female detective." (*Id.* at 6–7.) He testified that he only confessed when he saw an officer with a shotgun lead Ms. Johnson around to the back of the house and push her to the ground. (*Id.* at 7.) At that point, he testified that he was again asked by the female detective whether he had raped the victim, and he responded in the affirmative, saying "I . . . did whatever you said I did, please don't kill her." (*Id.*) He conceded that the officers did not touch him, but stated they did not have to because they had

their guns pointed at his head. (*Id.*) The petitioner testified that the female officer "read him his rights after she 'got him to admit to raping the woman.'" (*Id.*)

The petitioner subsequently gave a video-recorded statement, before which he was read his *Miranda* rights by Detective Kim Gooch. (*Id.*) Detective Gooch had been in the hospital with the victim when she was examined, and testified (by deposition) that she had obtained samples as a result of the victim's examination, which she turned in to the Tennessee Bureau of Investigation's crime laboratory. (*Id.* at 8.)

> The detective said that, after interviewing both the victim and the Defendant, she created a photographic lineup, which she showed to the victim. The victim identified a photograph of the Defendant as the man who had kidnapped and raped her.
>
> Detective Gooch testified that the victim told her that the Defendant had approached her at the Hermitage Fitness Center with a weapon, forced her into the passenger seat of her car, and then drove to another location. At that location while the two were in or near the car, he raped her orally, anally, and vaginally, and then he put her in the trunk of her car. The Defendant, she said, transported her to another location, a building in the Rivergate area, and he took her out of the trunk and then raped her again.

(*Id.* at 8–9.)

The trial court denied the motion to suppress, finding that the petitioner was not a credible witness, that the officers informed him of his *Miranda* rights before he made any incriminating statements and did not threaten him, and that he "made an intelligent, knowing, and voluntary waiver of his Miranda rights that was not given as a result of threats of force or coercion." (*Id.* at 9–10.)

The petitioner next filed a motion to dismiss the indictment due to the destruction of the "rape kit" that was administered to the victim at the hospital, which contained biological evidence that could have been subjected to DNA testing but was not. Sergeant Wilford Klotzback testified at the hearing on the motion to dismiss, stating that his records indicated that the rape kit was

marked destroyed on February 15, 2000, despite the fact that the court order authorizing its destruction was signed on February 25, 2000. (*Id.* at 10–11.) Another sergeant, Phillip Sage, supervised the property room at the time the rape kit was destroyed and testified as follows:

> The property room officers would check and verify that the case had been adjudicated in court and that there were no appeals pending, which would cause them to retain possession of the evidence.
>
> Sergeant Sage testified that this case had gone through the court system and appeared to be "completely over with." The property room officers, therefore, added it to a list of other cases to be destroyed. The list was submitted to the trial court for the authority to destroy the property. Sergeant Sage testified that Judge Wyatt approved the destruction, and the property was destroyed after his office received the judge's order.
>
> \*\*\*
>
> During cross-examination, Sergeant Sage testified that the discrepancy in dates could have been a typographical error.

(*Id.* at 11.) On August 2, 2012, the trial court denied the petitioner's motion to dismiss the indictment. (*Id.*)

On April 17, 2012, the petitioner filed a motion in limine before the trial court, which he supplemented on August 17, 2012, requesting that the court "rule on whether he could present evidence that DNA evidence was unavailable and whether the State could present evidence that he had previously pled guilty." (*Id.*) In his motion, the petitioner "contended that the State had recovered a biological specimen during the victim's medical examination and that this evidence was never tested," despite the fact that the specimen was in the State's possession for eight months prior to the entry of the petitioner's guilty plea. (*Id.* at 11–12.) The petitioner acknowledged that the rape kit was ultimately destroyed due to his guilty plea, but "wanted to be able to inform the jury that the evidence was destroyed but not have the jury know the reason for its destruction." (*Id.* at 12.) The trial court ruled that the fact of the rape kit's destruction was not relevant, but that even

if it were, the introduction of that fact without also allowing proof of the petitioner's guilty plea would be unfairly prejudicial to the State. The court further stated that it was "not in any way preventing the defendant from arguing there is a lack of proof . . . but to specifically allow [only] the questioning concerning the lack of DNA testing when we all know that—why there was not DNA testing would be extremely misleading and confusing to the jury." (*Id.* at 13.)

The case then proceeded to trial. The victim testified that in March 1995 she was thirty-three years old, married, and living in Davidson County. She was in the parking lot of the Hermitage Fitness Center around 7:30 p.m., attempting to enter her car and pull the door closed behind her, when the petitioner pulled the door open, pointed a gun at her, and told her to scoot over. The petitioner entered the vehicle, started the car, and drove away. He told the victim that he was going to let her go soon, but that he would kill her if she tried to get away. The petitioner drove toward the Hermitage and parked near the main gates, which were closed. He then held his gun to the victim's head and forced her to perform oral sex on him. He then told the victim to get out of the car, where he proceeded to bend her over the car hood and attempted to penetrate her anally. When this was unsuccessful, the petitioner forced the victim to lie face down in the back seat of the car, where he penetrated her vaginally. (*Id.* at 14–15.) The victim testified "that the car doors were open during these events, and the car light was illuminated providing her with a good view of the Defendant during the attack." (*Id.* at 15.) After this attack,

> [t]he victim said that the Defendant opened the trunk of the car and removed a wheelchair that belonged to her mother-in-law. He then forced her into the trunk and slammed the lid of the trunk shut. The Defendant then told her that he was going to let her go after a while and to be quiet. The victim said that, from the trunk, she could hear the Defendant listening to rap music at a loud volume. She also heard the Defendant making telephone calls. The victim said that, at one point, the Defendant stopped the vehicle and told her he was going to let her go in a few minutes. When the Defendant opened the trunk, the trunk light illuminated, and the victim could again see his face.

(*Id.*) The petitioner closed the trunk and continued to drive but stopped again behind a brick building a short time later. He ordered the victim out of the trunk and again forced her to perform oral sex, then ordered her into the back seat of the car where he again vaginally raped her. (*Id.*)

> The victim testified that, during one the rapes, she had an asthma attack. The Defendant asked her if she had asthma, and, when she responded affirmatively, he acted concerned. He, however, placed her back inside the trunk of the car after raping her. The victim said she was in the trunk for "[a] long time." The Defendant then cracked the lid of the trunk and asked the victim how to open the gas door. He told the victim that if she screamed, he would kill her. She told him how to open the gas door, and he pushed the trunk closed again.
>
> The victim said that, at some point thereafter, the Defendant backed into something. He stopped the car and asked if the victim was okay. He apologized, telling her he had backed into a pole. The victim said the Defendant drove around for some length of time. She heard him tell someone on the telephone that he wanted to get some sleep. She then heard what she thought was him getting out of the car because she heard the car door open and shut and heard a dog barking like "it wanted to get off its chain and kill someone." She then heard what sounded like a metal screen door to a house open and shut, and the dog stopped barking.
>
> The victim said she started feeling around the trunk, and she found a toolkit that her mother-in-law kept in the trunk. She said that she opened it and found a "nut driver." She used it to "pop[]" open the trunk. She cracked it slightly and saw that there were trees on one side. It appeared that there was a house or a trailer that had lights and a picture window facing the car. The victim said she was concerned about exiting the trunk for fear that the dog she had earlier heard might attack her before she could reach the nearest house. Her concern was heightened by the fact that she had difficulty walking because of her knees. For these reasons, she closed the trunk.
>
> The victim testified it was "quite some time" before the Defendant came out of the house, but she did not think it was long enough for him to get a full night's sleep. She heard the Defendant get into the car and start it again. She heard the stereo "blaring," and could feel the car moving again. The Defendant, she said, drove for quite some time. The victim said that she was aware that the sun had risen because she could see sunlight filtering into the trunk from the taillights.

(Id. at 15–16.) Later that morning, after stopping behind a strip mall to let the victim out to urinate,

> the Defendant again put her in the trunk. He drove, and the trunk became stifling. She heard the car door slam and also a house door open and close. The victim said she waited a short period of time and then "[p]opped" the trunk again. She only cracked it to see out. She was able to see another house, so she knew it was a fairly well-populated area. The victim got out of the trunk, and closed the trunk, making

sure it did not slam or make any noise. The victim said that, because she was unsure which house the Defendant had entered, she walked between a couple of houses to another road. She saw a couple working in their garden, and she called to them and asked the woman if she could call the police. The woman agreed and invited the victim to come into their home.

The victim recounted that the police arrived quickly, and she gave them a description of the Defendant. The victim said that police transported her from the couple's house to the police station where she spoke with officers and gave a statement. She helped police officers find some of the locations where the attacks had occurred, and she went to the hospital for a medical examination. The victim said she also identified the Defendant from a photographic lineup created by the police.

The victim identified a picture of the gun that the Defendant pointed at her, and she said that she believed that it was a real weapon at the time. The victim also identified photographs of the McDonald's bag in the trunk of the car, the towel she used when she urinated that was located in the backseat of the car, and her purse in the driver's seat. The victim identified a photograph of a white stain on the front seat of the car, and she said that the stain was a result of the sexual assaults.

During cross-examination, the victim testified that a police officer informed her that the Defendant was in custody and that some of her belongings were recovered from the house where he had been arrested. She said that she described the Defendant to police as between five feet five inches and five feet eight inches tall. The victim agreed that she was mistaken and that the first assault occurred in the front seat and not the back seat of the car. The victim agreed that she saw the Defendant when he was being arrested by police at the Clearwater Court house. She further agreed that this was before she was shown the pictures for the photographic lineup. She said, however, that this did not influence her recollection of the Defendant's appearance.

During redirect examination, the victim said that because she had multiple opportunities to view the Defendant during daylight hours, she was confident in her identification of him.

(*Id.* at 17–18.)

After the victim testified, the following testimony was given by the responding law

enforcement officers:

Detective Charles Thomas with the Rutherford County Sheriff's Office testified that at 10:00 a.m. on March 16, 1995, he responded to a 911 call for help. He said that 911 had received a call from a woman at 610 Sedridge Drive, who said that the

victim had come to her home asking for help, saying that she had been kidnapped and had gotten out of a car located at 7822 Clearwater Court.

Detective Thomas testified that he first responded to 610 Sedridge Drive. Once there, the victim told him that her car was located at 7822 Clearwater Court. The detective proceeded to 7822 Clearwater Court, where he saw the car that the victim had described and noted that the trunk of the car was ajar. Detective Thomas knocked on the door several times, and a woman named Tonya Johnston came to the door. Ms. Johnston told the detective that she lived at the residence with her mother. The detective asked her whose car was parked in the driveway, and Ms. Johnston responded that it belonged to her cousin's friend.

Detective Thomas testified that Ms. Johnston opened the door and turned and walked into the house, and he and another detective followed her. As she was walking, Ms. Johnston was talking to an individual in the bedroom, who the detective later identified as the Defendant. The Defendant was lying on a bed in the bedroom, and Detective Thomas asked him to get up. The other detective took the Defendant outside, and Detective Thomas briefly looked around for weapons in the house. The detective then asked Ms. Johnson what she knew about this situation.

Detective Thomas said he went outside and administered to the Defendant his *Miranda* warnings. The Defendant then told him that he needed a ride from Nashville, so he kidnapped a lady, put her in the trunk of her car, and drove to this house. Another detective, Detective Acton, was also present and asked the Defendant if he raped the woman. The Defendant responded that he did rape her. He said he was eventually going to let the woman go. Detective Thomas testified that both the victim and the Defendant were separately transported to the police station.

(*Id.* at 18.)

Charles Ray Blackwood, Jr., a crime scene investigator for the Metropolitan Nashville Police Department, testified that he processed the victim's vehicle and took photographs, fingerprints, and other evidence from the vehicle. (*Id.* at 19.) Blackwood also gathered evidence from inside the trunk of the car, including the "nut driver" that the victim said she used to get out of the trunk. (*Id.*) "Investigator Blackwood said that he tested the nut driver on the trunk and found that he could release the trunk lock and open the trunk with the nut driver." (*Id.*)

Amanda Preble Acton was a detective at the time of the petitioner's arrest, and testified that she responded to the Clearwater Court address, and was present when the petitioner was read

his *Miranda* rights and made statements to the police. Acton testified that the petitioner, in response to her questions, confessed to raping the victim and later gave a handwritten statement in which he set out the following sequence of events: "I pick[ed] up the lady at the . . . fit[ness] center; calm her down. Drove off to the Hermitage; had sex. Put her in the trunk. Drove to pick up some money. She was in the trunk for about five hours, I think. Went to my girlfriend. Got picked up. She made me nervous so I put her in the trunk." (*Id.* at 20.)

Kimberly Gooch, a detective with the Metropolitan Nashville Police Department adult sexual crimes unit at the time of the Defendant's arrest, testified that she interviewed the victim and the petitioner. Detective Gooch testified that during her interview with the petitioner, he admitted to abducting and raping the victim and accepted responsibility for these actions. (*Id.* at 21.) During her interview with the victim, Detective Gooch showed her a photographic lineup containing the petitioner's photograph, and the victim identified the petitioner as her assailant. (*Id.*)

Marilee Weingartner, a family nurse practitioner, testified that she performed the examination of the victim in this case and wrote a report documenting the examination. "Ms. Weingartner read the portion of her report that contained the victim's statement of what had happened, and it substantially comported with the victim's trial testimony." (*Id.*) Ms. Weingartner gathered a sample of vaginal fluid which she identified as containing sperm, and testified that she gave Detective Gooch the evidence that she had gathered during the examination. (*Id.* at 22.)

The following testimony about the forensic evidence was then received:

Margaret Bash, an agent with the TBI crime laboratory, testified that she received the evidence contained in the medical legal kit in this case. She discovered spermatozoa and semen in the victim's vaginal fluid that indicated that the intercourse had occurred within twenty-four to thirty-six hours before the sample was taken. She did not find semen or spermatozoa from the sample taken from the

victim's mouth, but she said this was not surprising considering that everyone produces saliva "pretty much" continuously.

Jacqueline Cockrill, a civilian working in police identification with the Metropolitan Nashville Police Department, testified that she examined the fingerprints submitted in this case. She found prints matching the Defendant's prints on: the steering wheel crank knob; the edge of the driver's door; the left rear door outside; the trunk; the trunk lid; and the BB gun.

(*Id.*)

After hearing this evidence, the jury convicted the petitioner of especially aggravated

kidnapping, aggravated robbery, four counts of aggravated rape, and attempted aggravated rape.

### III. Issues Presented for Review

The petitioner presents the following claims, quoted directly from his petition:

1. The trial court and the Criminal Court of Appeals violated the petitioner's right to due process pursuant to *Brady v. Maryland* in his cases [when] it refused to dismiss[] criminal charges in his case after it was discover[ed] that the State had destroyed all the DNA evidence in his case.

2. The Tennessee Criminal Court [of] Appeals has fail[ed] to rule on issues raised by the petitioner[] on his appeal to Criminal Court of Appeals.

3. The trial court and state Attorney General violated the [petitioner's] right to due process and his constitution[ally] protected right to due process[,] Sixth Amendment and Fourteenth Amendment due process of law[, and] equal protection.

4. The petition[er]'s trial counsel, [appellate counsel], [and] post-conviction counsel violat[ed] the petitioner's right to [the effective assistance of counsel] during trial and appeal.

(Doc. No. 1 at 9, 31, 41, 56.)

### IV. Legal Standard

The statutory authority of federal courts to issue habeas corpus relief for persons in state

custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only

on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is

"contrary to" clearly established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under § 2254(d)(2) simply because it disagrees with the determination; rather, the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings.'" *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 and n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1)). Moreover, under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected

on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Petitioner carries the burden of proof. *Pinholster*, 563 U.S. at 181.

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system. 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182. This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review"). Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315

(2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot

establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006).

## V. Analysis

### A. Claim 1: The State Courts violated the Petitioner's Right to Due Process by Refusing to Dismiss Charges After the State Destroyed DNA Evidence

The petitioner argues that the trial court violated his rights by allowing the District Attorney General to refer to the rape kit evidence obtained during the medical examination of the victim, despite the unavailability of that evidence for testing due to its destruction by State officers. He further argues that the trial court erred by refusing to allow trial counsel to assert the potential unreliability of that evidence due to lack of testing prior to its destruction, without also allowing the State to introduce the fact of the petitioner's original plea of guilty. He raised these claims on direct appeal to the Court of Criminal Appeals, which recognized that, "[t]o facilitate the right to a fair trial, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." (Doc. No. 20-21 at 27 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963).) The Court of Criminal Appeals further recognized that the State has a duty (derived from, *e.g.*, *Brady*) to preserve potentially exculpatory evidence "that might be expected to play a significant role in the suspect's defense," i.e., evidence "of such a nature that the defendant would be unable to obtain comparable evidence by other

reasonably available means." (*Id.* at 28 (citing *State v. Merriman*, 410 S.W.3d 779 (Tenn. 2013), and *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999)).)

Nonetheless, the Court of Criminal Appeals agreed with the trial court that the State's duty to preserve the biological evidence from the victim's rape kit "was not binding for perpetuity." (*Id.* at 29.) The court further found as follows:

> We agree with the trial court that this case presents a factually unique set of circumstances. The Defendant pled guilty in 1995, he filed a petition for post-conviction relief which the post-conviction court denied, this Court affirmed, and the Tennessee Supreme Court affirmed in 1999. Shortly thereafter, in 2000, the rape kit was destroyed as part of a routine cleaning of files. Subsequently, the Defendant filed several more post-conviction petitions and a petition for habeas corpus relief, which was ultimately successful. Under these circumstances, we agree with the trial court that the State did not have a duty to preserve this evidence.

(*Id.* at 30.) Despite finding that the State did not breach any duty to preserve this evidence under the circumstances, the Court of Criminal Appeals proceeded to engage in a multi-factored analysis to determine whether the petitioner was denied a fundamentally fair trial in the absence of the rape kit evidence:

> [L]ooking to those factors, we first conclude that the State was not negligent in destroying the evidence. The Defendant pled guilty, his case was affirmed on post-conviction, and [the] State sought a court order approving of the evidence's destruction, which a trial court signed before the State destroyed the evidence. The second factor, addressing the significance of the destroyed evidence, weighs in favor of the Defendant. This evidence would clearly be significant. The third factor, the sufficiency of the other evidence supporting the conviction, strongly weighs in favor of the State. The Defendant was found in a house where the victim's car was parked, and his fingerprints were on the car, the trunk, and the weapon. The victim identified the Defendant in a photographic lineup as the rapist, and the Defendant confessed to the crime on multiple occasions to multiple officers after being given his *Miranda* warnings. There was, therefore, sufficient other evidence supporting his conviction. Accordingly, we conclude that the trial court did not err when it denied the Defendant's motion to dismiss this case, and he is not entitled to relief on this issue.

(*Id.* at 31.)

While the petitioner attributes nefarious motives to the State officers who destroyed the rape kit and intimates that he has been the victim of malicious prosecution (Doc. No. 1 at 25–26), his due process claim ultimately rests on his assertion that "[i]t does not matter if [the evidence] was there when the petitioner plead guilty in 1995, it was not there when he went to trial in 2012 and the petitioner . . . was denied [a] fundamentally fair trial without this DNA evidence." (Doc. No. 1 at 31.) However, the contrary finding of the Court of Criminal Appeals did not result in a decision that was contrary to, or based on an unreasonable application of, the clearly established rule of *Brady* that criminal defendants are entitled to materially exculpatory evidence. "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Here, it is not known whether the rape kit evidence was exculpatory at all, as counsel conceded prior to trial. (Doc. No. 20-2 at 71.) In light of the fact that the petitioner originally pled guilty in the wake of the collection of this evidence, as well as the prodigious amount of other evidence of his guilt, it is safe to say (as the Court of Criminal Appeals did) that no reasonable probability exists that the outcome of the trial would have been different if this evidence were available. This claim is without merit.

Relatedly, there is no merit to the claim that the trial court unconstitutionally precluded the petitioner from presenting evidence that the rape kit evidence had not been tested for DNA, unless he was willing to see evidence of his prior guilty plea admitted. The Court of Criminal Appeals recognized that "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony," but further noted that this right is tempered by the duty to comply with established evidentiary rules. (Doc. No. 20-21 at 31–32 (citing *Chambers v. Mississippi*, 410 U.S. 284 (1973)).) That court upheld the trial court's finding that the rule of

relevance, as well as the rule against admitting misleading testimony, prevented the admission of evidence that the rape kit evidence had not been subjected to DNA testing:

> We first turn to decide whether the evidence that there was no DNA testing of the "rape kit" is relevant. The trial court held that this evidence was not relevant, given the reason for the lack of DNA testing. The Defendant confessed to the crimes upon arrest shortly after he committed the crimes. Despite the wealth of evidence against the Defendant, law enforcement officers still brought the victim to the hospital for a medical examination, that included a "rape kit." When the Defendant pled guilty, however, the State had no reason to further use State resources to test the DNA evidence in the kit. Ultimately, that kit was destroyed. We conclude that the trial court did not abuse its discretion when it determined that evidence that the State failed to test the DNA evidence was not relevant. Even were we to conclude otherwise, we agree with the trial court that the evidence, presented alone, would be misleading.

(*Id.* at 32–33.) The court proceeded to find that, even if the evidence that the rape kit was untested were relevant, its probative value would be substantially outweighed by the fact that the introduction of this evidence without the explanation as to why the testing was not performed "would be extremely misleading and confusing to the jury," as found by the trial court. (*Id.* at 33.) This determination by the State courts is not contrary to, or based on an unreasonable application of, federal law, and habeas relief is therefore unavailable.[2]

>    B. Claims 2 and 3:    The Court of Criminal Appeals Failed to Consider Certain Claims that the Petitioner Raised in the Post-Conviction Trial Court

In his second claim for relief, the Petitioner argues that the Tennessee Court of Criminal Appeals violated his due process rights when it failed to adjudicate the following claims that he raised before the post-conviction trial court: "1. That the Judge Steve R. Dozier violated the

---

[2]    The petitioner argues for the first time in his reply brief that his constitutional right to have DNA evidence admitted at his trial was also violated because his trial counsel "did not fight" for him on this score. (Doc. No. 28 at 3.) Besides being demonstrably false (*see* Doc. No. 20-2 at 70–79), this argument suffers from the same shortcomings as the petitioner's other arguments concerning the rape kit and its testing, and is therefore without merit.

Petitioner's right to Due Process by having the Criminal Court Clerk's Officers remove his case from his docket[;] 2. That the petitioner was not taken before a magistrate within . . . 72 hour[s] of his arrest of 12-21-10 by Davidson County Sheriff Department[;] [and] 3. That the petitioner was prosecuted outside of the statute of limitations." (Doc. No. 1 at 31–32.) The petitioner also argues that the Court of Criminal Appeals failed on post-conviction appeal to consider his due process argument vis-à-vis the destroyed rape kit evidence. In his third federal habeas claim, the Petitioner argues the merits of the three post-conviction claims quoted above, as well as presenting allegations of judicial bias (Doc. No. 1 at 46–53) and a race-based equal protection argument (*id.* at 44–45, 52).

The court has already addressed the state courts' adjudication of the destroyed evidence issues. As to the petitioner's contentions around claims that were raised at the post-conviction trial level but not addressed by the Court of Criminal Appeals, these claims were clearly defaulted when the petitioner, through counsel, failed to present them on appeal. As recited earlier in this opinion, only four claims were raised by the petitioner on post-conviction appeal, all involving the ineffective assistance of trial counsel. (Doc. No. 20-29 at 5, 11.) The petitioner does not attempt to argue the existence of cause excusing his default of the claims identified above, and he is therefore not entitled to further review of those claims.

### D. Claim 4:    Ineffective Assistance of Counsel

In his fourth claim, the petitioner asserts that his trial counsel was ineffective in failing to (1) investigate "why the court refused to hear his pro se motion from the time of January 1, 2011 til April 11, 2011"; (2) act diligently in response to the petitioner's request that he "go to the evidence room to see if the DNA evidence had been checked out for testing"; (3) act diligently "when the petitioner told him to go and get the Rape Kit in his case tested after the petitioner's

bond hearing"; (4) raise the statute of limitations and speedy trial issues; and (5) challenge the victim's identification of the petitioner or her history of sexual abuse and mental health issues. The petitioner asserts that his appellate counsel was ineffective in failing to raise claims on direct appeal that the petitioner directed him to raise. Finally, he claims that his post-conviction counsel was ineffective in failing to secure an expert witness to challenge the victim's identification of the petitioner with physical characteristics that he does not, in fact, possess. (Doc. No. 1 at 56–60.)

However, the petitioner exhausted only four claims of ineffective assistance of counsel on post-conviction appeal. These claims concerned counsel's failure to introduce a photograph in support of a misidentification theory; failure to investigate the victim's mental health history for impeachment purposes; failure to seek the recusal of the trial judge; and failure to pursue the issue of whether the charging instruments were adequate. (Doc. No. 20-29 at 5, 11.) The Court of Criminal Appeals addressed these claims as follows:

> Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

> \*\*\*

> In our view, the record fully supports the ruling of the post-conviction court. Trial counsel testified – and the trial court explicitly accredited his testimony – that he chose not to introduce into evidence a photograph of LeVar Burton because the petitioner's passing resemblance to the actor could have been potentially detrimental to the petitioner's case. Likewise, trial counsel stated that he elected

not to question the victim about any alleged mental health issues because he believed that to do so would have only increased the jury's sympathy toward the victim. We will not second-guess these reasonable trial strategies. *See Adkins* [*v. State*], 911 S.W.2d at 347. Furthermore, trial counsel testified that he researched the issue of the adequacy of the charging instruments and determined that no legal justification existed to pursue the issue. Again, this testimony was explicitly accredited by the trial court, and because of trial counsel's adequate preparation, this tactical decision does not entitle the petitioner to relief. *See Cooper* [*v. State*], 847 S.W.2d at 528. Finally, the petitioner has failed to demonstrate that he was prejudiced by trial counsel's failure to seek recusal of the trial judge. *See, e.g.*, *Owens v. State*, 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999), *perm. app. denied* (Tenn. Feb. 28, 2000) (holding that trial court did not abuse its discretion by denying recusal motion when trial judge had been one of 70 employees of the local district attorney's office and had never been assigned to the petitioner's case). As such, we hold the petitioner has failed to prove by clear and convincing evidence that trial counsel's representation was deficient or prejudicial.

(Doc. No. 20-31 at 6.)

The Court of Criminal Appeals adjudicated these ineffective assistance claims in accordance with the standards expressed by the U.S. Supreme Court in *Strickland*, and this court finds that the decision reached was not contrary to or an unreasonable application of those standards. As for the remaining, defaulted claims of ineffective assistance of trial, appellate, and post-conviction counsel, the petitioner does not attempt to establish cause excusing his default of those claims. *Coleman v. Thompson*, 501 U.S. 722, 748–50 (1991). Although the petitioner claims that his post-conviction counsel was ineffective in failing to secure an expert to testify at his evidentiary hearing, there is no right to counsel at such proceedings, *id.* at 755, and the petitioner does not argue counsel's ineffectiveness as cause excusing the default of any ineffective-assistance-of-trial-counsel claims. *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Nor could he be heard to argue that his post-conviction appellate counsel was ineffective in failing to include such claims of trial- or appellate-counsel ineffectiveness and thus caused their default, as there is no right to the effective assistance of counsel on appeal from the denial of post-conviction relief. *Coleman*, 501 U.S. at 755–56. The petitioner is not entitled to relief on these claims.

## VI.  Conclusion

For the foregoing reasons, the habeas corpus petition will be denied and this matter will be dismissed with prejudice.

When the district court denies a ground for relief on the merits in a habeas corpus action, a certificate of appealability (COA) "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the standard being whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because the petitioner has not made a substantial showing of the denial of a constitutional right with respect to any ground for relief asserted in the petition, a COA will not issue.

An appropriate order will enter.

_____
Aleta A. Trauger
United States District Judge